## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____
                                   )
WHITE MOUNTAIN APACHE TRIBE,    )
                                   )
              Plaintiff,          )        No. 17-359C
                                   )
          v.                  )        Filed: December 16, 2021
                                   )
THE UNITED STATES,               )
                                   )
            Defendant.       )
_____ )

### OPINION AND ORDER

Before the Court is the Government's Motion to Dismiss or for Summary Judgment on Plaintiff White Mountain Apache Tribe's ("Tribe") Phase I claim under the Indian Lands Open Dump Cleanup Act of 1994 ("the Act"), 25 U.S.C. §§ 3901–3908 (1994). The Government contends that the Tribe's claim should be dismissed under Rules 12(b)(1), 12(b)(6), and 12(c) of the Rules of the United States Court of Federal Claims ("RCFC"). Alternatively, the Government asks the Court to grant summary judgment in its favor pursuant to RCFC 56(c). Without addressing all of the Government's arguments, the Court determines it lacks subject-matter jurisdiction over the Tribe's claim since the Act imposes no specific fiduciary obligations upon the Government. Accordingly, the Government's Motion to Dismiss is **GRANTED** pursuant to RCFC 12(b)(1), and its alternative request for summary judgment is **DENIED AS MOOT**.

## I.  BACKGROUND

### A.    Factual Background

The facts relevant to the Tribe's Phase I claim are largely undisputed. The Tribe resides on and is the beneficial owner of the Fort Apache Indian Reservation ("Reservation") in eastern Arizona. Through its Tribal Public Works Department ("Public Works") and with the help of its

Environmental Planning Office ("EPO") and other tribal governmental authorities, it regulates solid waste disposal on the Reservation. *See* Open Dump Cleanup Project Jan. 31, 2005 at 6, ECF No. 66-3; Integrated Solid Waste Mgmt. Plan 2019–2024 at 11, ECF No. 66-5. Open dumps are, and have been, a consistent problem on the Reservation, whether contributed to by Tribe members, the tribal government, non-Tribe members (both residents and visitors), or the federal government. *See, e.g.*, Solid Waste Mgmt. Plan Aug. 1994 at 5, 38, ECF No. 66-2 (discussing the problem of unmanaged waste disposal and the removal of federal agency waste); ECF No. 66-5 at 17, 21; Letter from Brenda Pusher-Begay (EPO) to Alfred Brooks (Public Works) (Jan. 9, 2017) at 2, 4, ECF No. 66-8 (describing illegal dumping activities by Public Works).

In the early 1990s, the Indian Health Service ("IHS"), the Bureau of Indian Affairs ("BIA"), and the Tribe began closing open dumps on the Reservation, some containing BIA waste. *See* ECF No. 66-2 at 38, 40–41. These federal agencies, as well as the U.S. Department of Housing and Urban Development and the U.S. Department of Agriculture, each provided funds through grants or loans for constructing the Tribe's landfill. *See id.* at 84, 87; Resol. No. 02-96-036, ECF No. 66-18. With the construction of the landfill, all remaining open waste dumps were supposed to close. Req. for Release of Funds and Certification at 2, ECF No. 66-19. By 1998, 15 of 24 identified open dumps had been permanently closed. Letter of Ronnie Lupe (Chairman) to Benjamin Nuvamsa (BIA) (Feb. 26, 1998) at 2, ECF No. 66-24. Over the next decade, the Tribe used its own funds and contributions from BIA and IHS, as well as funds from Environmental Protection Agency ("EPA") grants, to inventory and clean up remaining dumps. *See, e.g.*, ECF No. 66-3 at 25; IHS Funding Spreadsheet at 2, 5, ECF No. 66-25; Letter from EPO to Bernie Hinton (BIA) (Mar. 21, 2002), ECF No. 66-26; STARS PDS Narrative at 3, ECF No. 66-27; Gen. Assistance Program Close-Out Report 10/1/2010 – 9/30/2012 at 2–3, 5, ECF No. 66-28.

Continued illegal dumping caused other dumps to spring up, however, and the number of open dumps fluctuated over the years. *See* ECF No. 66-2 at 5; ECF No. 66-5 at 20–21. In March 2016, the Tribe's open dump inventory identified eight open dumps, and by October 2016 that number skyrocketed to 85. *See* WMAT Regulated Facilities List at 5, ECF No. 66-29; Email from Brenda Pusher-Begay (EPO) to Orlando Tessay (Oct. 7, 2016) at 2–5, ECF No. 66-30. In June 2020, well before the Tribe first filed its Complaint, IHS completed its own nationwide resurvey of open dumps on Indian land and concluded that the Reservation had approximately 45 visible open dump sites. Def.'s Resps. to Pl.'s First Set of Interrogs.: Indian Health Service at 5, ECF No. 66-34. Presumably included among these open dumps is the Sunrise Landfill, which the Government has acknowledged may contain federal waste not cleaned up in prior dump closure efforts. *See* Mem. of Points & Auth. in Support of Mot. to Dismiss or for Summ. J. at 15–16, ECF No. 66-1; Ltd. Subsurface Investigation: Fort Apache Agency Sunrise Ski Resort Dumpsite at 4, ECF No. 66-43 (detailing BIA's investigation into its own responsibility for dumping at Sunrise Landfill).

Financial assistance from the Government related to all manner of issues, including open dumps, has flowed to the Tribe throughout the years. Between 1982 and 2019, IHS gave approximately $94.5 million in funding to the Tribe, with at least $561,500 of that amount dedicated to cleaning up open dumps.[1] *See* ECF No. 66-25 at 2 (listing funding provided in fiscal years 1997 and 2004). Additionally, IHS provided $140,000 for the Tribe's Whiteriver Landfill expansion in 2018. ECF No. 66-25 at 5. Between 2002 and 2019, EPA also provided over $3

---

[1] The Tribe alleges that IHS has not allocated any additional funding dedicated to closing open dumps or for post-closure maintenance since 2004, while the Government states that IHS provided approximately $281,500 between 2004 and 2009 to clean up four existing dumps. Pl.'s Resp. to Mot. for Dismissal at 6, 20–21, ECF No. 70; ECF No. 66-1 at 15.

million in General Assistance Program ("GAP") grants which were used for cleaning up open dumps, among other waste related causes.   Federal Agency Funding Related to Reservation Sanitation at 2, ECF No. 66-37; *see* EPA Notices of Award 2006 – 2019, ECF No. 66-33; EPA Commitment Notices 2002 – 2005, ECF No. 66-36.   Recently, the Tribe requested additional IHS funds for landfill expansion.   Letter from Colbert G. Burnette (Tribal Engineer) to Lorenzo Santana (IHS) (June 14, 2019) at 5, ECF No. 66-39.

### B.      Procedural Background

On March 15, 2017, the Tribe filed its Complaint, alleging the United States, as trustee of the Tribe's "funds, land, timber and other assets," had breached its fiduciary duties to the Tribe. *See* Pl.'s Compl. ¶ 1, ECF No. 1.   The bulk of the Complaint's allegations relate broadly to mismanagement of trust funds and timber resources, although it also contains allegations regarding dam safety, mineral resources, environmental contamination, rights-of-ways, leases, and grazing. *See id.* ¶¶ 29–60.   The Tribe's allegations relevant to open dumps are contained in its one-paragraph environmental contamination claim, which alleges that "[s]ome Reservation trust lands have been contaminated by non-Tribal entities with hazardous waste, pollution, and other harmful substances." *Id.* ¶ 15.   The Complaint also cites the Act, amongst a slew of other statutes, as supporting the Tribe's claims. *Id.* ¶ 20.

The Government first moved to dismiss the Tribe's claims on July 14, 2017.   *See* Def.'s Mot. to Dismiss, ECF No. 9.   The court denied the motion as to the Tribe's trust fund, dam safety, minerals, contamination, rights-of-way, and leases allegations, and granted the Government's motion as to the Tribe's grazing and forestry claims.[2]  Op. & Order at 9–10, 14, ECF No. 22.   Nine

---

[2] Prior opinions and orders referenced herein were issued by Senior Judge Damich and Judge Hertling.   This case was reassigned to the undersigned on December 21, 2020.

months later the Government filed a Motion to Certify Interlocutory Appeal on the Tribe's dam claims, which the court denied.  *See White Mountain Apache Tribe v. United States*, No. 17-359 L, 2018 WL 6293242 (Fed. Cl. Dec. 3, 2018).

Moving forward, the court divided this case into phases and allowed jurisdictional discovery on the Tribe's Phase I minerals, leases, rights-of-way, and contamination claims.  *See* ECF No. 22 at 10; Scheduling Order, ECF No. 31; Joint Mot. for Enlargement of Time ¶ 2, ECF No. 60; Order, ECF No. 61.  Following discovery, the Tribe withdrew its minerals, leases, rights-of-way, and non-dump contamination claims, leaving only an open dump claim set forth in the court-ordered claim specification it produced on September 1, 2020.  *See* Email from Brian Chestnut (Pl.'s Counsel) to Matthew Marinelli (ENRD) (Sept. 1, 2020) at 2, ECF No. 66-46 ("The only Phase I environmental claim the Tribe will be making is concerning open dumps . . . ."); White Mountain Apache Tribe—Identification of Environmental Claims at 2–3, ECF No. 66-47.

In its claim specification, the Tribe claims that the Government breached its trust responsibilities by "failing to provide adequate financial and technical assistance to: (1) inventory dumps; (2) develop a plan to close dumps; (3) close dumps and (4) provide postclosure maintenance of such dumps."  ECF No. 66-47 at 2.  Plaintiff identified the dates of its claim as pertaining to: (1) open dumps of which the Tribe knew or should have known from March 16, 2011, to present; and (2) open dumps that the Tribe identified to the Government before March 16, 2011, where the Tribe relied on Government assurances that it would provide assistance that never materialized.  *Id.* at 3.  As the statutory basis for its claim, the Tribe cites the Act, "as informed by" the Resource Conservation and Recovery Act ("RCRA"); 42 U.S.C. §§ 6901–6992k (1976); the Snyder Act, 25 U.S.C. § 13 (1998); and 25 U.S.C. § 162a(d)(8) (1994).  *Id.*

On November 16, 2020, the Government filed its second Motion to Dismiss or for Summary Judgment on the Tribe's Phase I Claim arguing, among other things, that the Act does not meet the jurisdictional requirements of the Indian Tucker Act, 28 U.S.C. § 1505 (1992), since it does not impose specific fiduciary duties on the Government or mandate compensation for any breach of duties. *See* ECF No. 66-1. It also argues that the Tribe has failed to plead facts necessary to support its claim, and, in any event, the Government is entitled to summary judgment on the merits. *See id.* at 37–45; Def.'s Reply at 18–20, ECF No. 72. On January 22, 2021, the Tribe filed its Response to the Government's Motion. *See* Pl.'s Resp. to Mot. for Dismissal, ECF No. 70. Following the close of briefing, the Court allowed further briefing on the Government's Notice of Supplemental Facts (ECF No. 73). *See* Pl.'s Mot. for Leave to File Resp. to Def.'s Notice of Suppl. Facts, ECF No. 74; Resp. to Def.'s Notice of Suppl. Facts, ECF No. 75; Def.'s Reply Regarding Notice of Suppl. Facts, ECF No. 77. The Motion has been fully briefed and is ripe for decision.

## II. DISCUSSION

### A.    Standard of Review

Although the Government's Motion requests relief pursuant to a number of rules, the Court believes this matter presents a clear jurisdictional question that is appropriately resolved under RCFC 12(b)(1). Subject-matter jurisdiction is a threshold matter; without it, "the only function remaining to the court is that of announcing the fact and dismissing the [case]." *Ex parte McCardle*, 74 U.S. 506, 514 (1869). The plaintiff "bears the burden of establishing subject-matter jurisdiction by a preponderance of the evidence." *See Inter-Tribal Council of Ariz., Inc. v. United States*, 956 F.3d 1328, 1337–38 (Fed. Cir. 2020) (internal quotation marks omitted) (quoting *M. Maropakis Carpentry, Inc. v. United* States, 609 F.3d 1323, 1327 (Fed. Cir. 2010)).

6

When considering a motion to dismiss for lack of subject-matter jurisdiction, the Court accepts as true all uncontroverted factual allegations in the complaint and draws all reasonable inferences in the light most favorable to the plaintiff.  *See Estes Express Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014) (citing *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583–84 (Fed. Cir. 1993)); *see also Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)).  The Court, however, is not strictly confined to the pleadings.  *Meyers v. United States*, 96 Fed. Cl. 34, 43 (2010).  If jurisdictional facts are disputed, the plaintiff may not rest on mere allegations; instead, he must produce competent proof sufficient to support his allegations by a preponderance of evidence.  *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936); *Taylor v. United States*, 303 F.3d 1357, 1359 (Fed. Cir. 2002).

**B.     The Court Lacks Jurisdiction to Entertain the Tribe's Open Dump Claim.**

The Government premises its jurisdictional argument on the contention that the Tribe has not identified any statute or regulation that imposes a specific, enforceable, money-mandating duty to clean up or provide compensation for open dumps on the Tribe's land.  *See* ECF No. 66-1 at 24. The Tribe argues that the Act "easily satisfies the two-part test for money-mandating claims," stating that the presence of 45 open dumps on the Reservation with no existing plan to fund closure of those dumps shows that the Government is out of compliance with the Act in violation of its fiduciary duties.  ECF No. 70 at 26.  Based on binding Supreme Court and Federal Circuit precedent, the Court concludes that the Tribe has not identified a trust-creating source of law sufficient to demonstrate jurisdiction under the Indian Tucker Act.

1.  <u>Jurisdiction Under the Indian Tucker Act</u>

The Indian Tucker Act provides the Court of Federal Claims with jurisdiction over any claim of an American Indian tribe against the United States "whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe . . . ." 28 U.S.C. § 1505. Like the Tucker Act, the Indian Tucker Act is a jurisdictional statute only. *United States v. Navajo Nation* ("*Navajo II*"), 556 U.S. 287, 290 (2009) (citations omitted). It provides no enforceable substantive rights; it only waives sovereign immunity for claims against the Government based on other money-mandating sources of law. *Id.* Whether jurisdiction is satisfied depends on a two-part analysis. First, the Tribe "must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed to faithfully perform those duties." *Hopi Tribe v. United States*, 782 F.3d 662, 667 (Fed. Cir. 2015) (internal quotation marks and brackets omitted) (quoting *Navajo II*, 556 U.S. at 290–91). If the Tribe satisfies the first request, the Court must then "determine whether the substantive source of law can be fairly interpreted as mandating compensation for damages sustained as a result of a breach of the duties the governing law imposes." *Id.*

a.  *Prong 1: Specific Fiduciary or Other Duties*

The Government's common law trust obligations alone cannot satisfy the first part of the analysis. Rather, the Government's violation of a "specific, applicable, trust-creating statute or regulation" is required. *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 177 (2011) (quoting *Navajo II*, 556 U.S. at 302). General trust relationships between the United States and a tribe also are insufficient. *Hopi Tribe*, 782 F.3d at 667 (citing *United States v. Mitchell* ("*Mitchell I*"), 445 U.S. 535, 542–44 (1980)). Instead, a tribe "must identify statutes or regulations that both

impose a specific obligation on the United States and 'bear the hallmarks of a conventional fiduciary relationship.'" *Id.* (internal brackets omitted) (quoting *Navajo II*, 556 U.S. at 301).

In *Mitchell I*, the Supreme Court considered whether the Indian General Allotment Act of 1887 ("Allotment Act"), 25 U.S.C. § 331 *et seq.* (repealed in part 2000), supported jurisdiction in the Court of Claims over a claim brought by members of the Quinault Tribe alleging that the Government mismanaged timber resources on the tribe's reservation. The Allotment Act authorized the President to allot agricultural and grazing land on a reservation to individual tribal members and provided that "the United States does and will hold the land thus allotted . . . in trust for the sole use and benefit of the Indian to whom such allotment shall have been made." 445 U.S. at 541 (quoting 25 U.S.C. § 348 (2006)). Despite this language, the Supreme Court determined that the Allotment Act imposed no judicially enforceable trust duty because sections of the Allotment Act indicated that the Indian allottee, not the United States Government, was responsible for using allotted land for agricultural and grazing purposes. *Id.* at 542–43. Moreover, even though title to the allotted land remained in the hands of the United States, the Indian allottee could continue to occupy the land as a homestead for personal use. *Id.* at 543. Because these provisions evidenced that the Allotment Act did not "unambiguously provide that the United States [had] undertaken *full fiduciary responsibilities* as to the management of allotted lands," the Supreme Court determined the Allotment Act did not support jurisdiction under the Indian Tucker Act. *Id.* at 542 (emphasis added).

Following remand proceedings in the same case, the Supreme Court found that other sources of law provided the level of government management and control that conferred jurisdiction over the Quinault Tribe's breach of trust claim. *See United States v. Mitchell* ("*Mitchell II*"), 463 U.S. 206 (1983). *Mitchell II* held that the Government had a specific fiduciary

obligation to manage forest resources on the Quinault Tribe's reservation given its "pervasive role in the sales of timber from Indian lands." *Id.* at 219. This role was demonstrated by applicable statutes and regulations that "addressed virtually every aspect of forest management including [(among other things)] the size of sales, contract procedures . . . allowable heights of stumps . . . [and] base and top diameters of trees for cutting," *id.* at 220, and that were "designed to assure that the Indians receive 'the benefit of whatever profit the forest [was] capable of yielding,'" *id.* at 221–22 (internal bracketing omitted) (quoting *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 149 (1980)). Pursuant to those authorities, Interior exercised "'comprehensive' control over the harvesting of Indian Timber," *id.* at 209 (citation omitted), and "literally daily supervision over [its] harvesting and management," *id.* at 222 (citation omitted). Because the Interior Secretary managed sales of timber "so as to obtain the greatest revenue for the Indians consistent with a proper protection and improvement of the forests," *id.* at 220 (internal quotation marks and citation omitted), the relevant statutory provisions directed him to consider "the needs and best interests of the Indian owner and his heirs" and required him to account for the need to "maintain[] the productive capacity of the land . . . the highest and best use of the land . . . and the present and future financial needs of the owner and his heirs," *id.* at 222 (quoting 25 U.S.C. § 406(a) (1964)). "Virtually every stage of the process" of managing tribal timber, the Supreme Court concluded, was subject to federal control. *Id.*

The Supreme Court reinforced its *Mitchell I* and *II* holdings in *United States v. Navajo Nation* ("*Navajo I*"), 537 U.S. 488, 510 (2003), determining that the Interior Secretary did not violate any trust obligation under the Indian Mineral Leasing Act of 1938 ("IMLA"), 25 U.S.C. § 396(a) *et seq.*, when he approved a royalty, under a lease between the Navajo Nation and a private company to mine coal on the tribe's land, considered to be half the coal's value. The Supreme

Court concluded that the IMLA and its implementing regulations did not impose specific fiduciary obligations on the Secretary since he was "neither assigned a comprehensive managerial role nor . . . expressly invested with responsibility to secure 'the needs and best interests of the Indian owner and his heirs.'" *Id.* at 507–08 (quoting 25 U.S.C. § 406(a)).  The Supreme Court noted that, as opposed to the IMLA regulations relating to oil and gas leases, which provided specific criteria for the Secretary to use when setting royalty rates, the regulations relating to coal "required only that the rate be 'not less than 10 cents per ton'" and placed no other limitations on the Secretary's approval authority or tribal negotiating capacity. *Id.* at 495 (quoting 25 C.F.R. § 211.15(c) (1985)). The IMLA authorized the Secretary to promulgate regulations governing coal mining operations, but because it "aim[ed] to enhance tribal self-determination by giving Tribes" the lead in negotiating mining leases, with the Secretary merely approving those leases, no fiduciary duty existed. *Id.* at 508.

### b. *Prong 2: Money-Mandating Source of Law*

The second part of the analysis is satisfied where the Tribe demonstrates that the source of law relied upon mandates monetary compensation from the Government. *Mitchell II*, 463 U.S. at 216–17; *see Ute Indian Tribe of the Uintah & Ouray Indian Rsrv. v. United States*, 145 Fed. Cl. 609, 624 (2019) ("The Tribe neglects, however, to carry its burden of showing that other sections of the [applicable statute] mandate monetary compensation.").  A statute is money-mandating in two circumstances: when (1) "it can fairly be interpreted as mandating compensation by the Federal Government for . . . damages sustained," or (2) "it grants the claimant a right to recover damages either expressly or by implication." *Lummi Tribe of the Lummi Rsrv. v. United States*, 870 F.3d 1313, 1317 (Fed. Cir. 2017) (internal quotation marks and numbering omitted) (quoting *Blueport Co., LLC v. United States*, 533 F.3d 1374, 1383 (Fed. Cir. 2008)).

A money-mandating statute need not contain a specific provision for damages. For example, in *United States v. White Mountain Apache Tribe*, the Supreme Court held that the Act of 1960, Pub. L. No. 86-392, 75 Stat. 8 (codified as 25 U.S.C. § 277), not only expressly defined a fiduciary relationship between the Tribe and the Government relating to the former military post of Fort Apache but also gave the Government the right to use portions of the property it held in trust for the Tribe. 537 U.S. 465, 475, 477 (2003). The Court held that it was fairly inferred by that trust relationship, the Government's actual occupancy of the property, and fundamental principles of trust law that the Government was liable in damages for any breach of its fiduciary duty to preserve property improvements. *Id.* at 475–76.

However, should the statutes or regulations relied upon to satisfy the question of jurisdiction grant officials "substantial discretion" in carrying out the statutory scheme, they generally cannot be interpreted as mandating compensation. *Wolfchild v. United States*, 731 F.3d 1280, 1292 (Fed. Cir. 2013) (internal quotation marks and citation omitted); *Doe v. United States*, 463 F.3d 1314, 1324 (Fed. Cir. 2006) ("A statute is not money-mandating when it gives the government complete discretion over the decision whether or not to pay an individual or group." (citation omitted)). Discretionary schemes are only money-mandating if they: "provide[] 'clear standards for paying' money to recipients; . . . state[] the 'precise amounts' that must be paid; or . . . compel[] payment on satisfaction of certain conditions." *Samish Indian Nation v. United States*, 657 F.3d 1330, 1336 (Fed. Cir. 2011) (numbering omitted) (quoting *Perri v. United States*, 340 F.3d 1337, 1342–43 (Fed. Cir. 2003), *vacated on other grounds*, 568 U.S. 936 (2012)).

2.    The Act Does Not Impose a Specific Trust Duty Upon the Government to Clean
      Open Dumps.

The Tribe identifies the Act, with a focus on § 3904,[3] as the substantive source of law

creating the alleged fiduciary duty and entitlement to monetary compensation at issue in its Phase

I claim.  ECF No. 66-47 at 3.  As pertinent to the Court's analysis, the Act directs IHS, "[u]pon

request by an Indian tribal government," to inventory and evaluate open dumps on Indian lands,

determine the relative threat of each dump to public health and the environment, and develop cost

estimates for closure and post-closure maintenance of the dumps.  25 U.S.C. § 3904(a)(1).

---

[3] Section 3904 provides in relevant part:
(a) **Reservation inventory**
    (1) Upon request by an Indian tribal government or Alaska Native entity, the Director shall—
        (A) conduct an inventory and evaluation of the contents of open dumps on the Indian lands or Alaska Native lands which are subject to the authority of the Indian tribal government or Alaska Native entity;
        (B) determine the relative severity of the threat to public health and the environment posed by each dump based on information available to the Director and the Indian tribal government or Alaska Native entity unless the Director, in consultation with the Indian tribal government or Alaska Native entity, determines that additional actions such as soil testing or water monitoring would be appropriate in the circumstances; and
        (C) develop cost estimates for the closure and postclosure maintenance of such dumps. . . .
(b) **Assistance**
    Upon completion of the activities required to be performed pursuant to subsection (a), the Director shall, subject to subsection (c), provide financial and technical assistance to the Indian tribal government or Alaska Native entity to carry out the activities necessary to—
        (1) close such dumps; and
        (2) provide for postclosure maintenance of such dumps.
(c) **Conditions**
    All assistance provided pursuant to subsection (b) shall be made available on a site-specific basis in accordance with priorities developed by the Director.  Priorities on specific Indian lands or Alaska Native lands shall be developed in consultation with the Indian tribal government or Alaska Native entity.  The priorities shall take into account the relative severity of the threat to public health and the environment posed by each open dump and the availability of funds necessary for closure and postclosure maintenance.

Following completion of these tasks, the Act directs that IHS "shall . . . provide financial and technical assistance to the Indian tribal government . . . to carry out the activities necessary to— (1) close such dumps . . . and (2) provide for postclosure maintenance of such dumps." *Id.* § 3904(b).  Subsection (c) conditions this assistance on priorities set by the Director of IHS ("Director") according to the Director's determination of the threat posed by each dump and the availability of funds. *Id.* § 3904(c).

As the Tribe sees it, the provisions of § 3904 are mandatory and reflect Congress's intent to "expressly establish[] the [Government's] obligation to manage a trust resource for the benefit of the Tribe." ECF No. 70 at 29 (citing *Pawnee v. United States*, 830 F.2d 187, 190 (Fed. Cir. 1987)).  Emphasizing the Act's prefatory statement that "the United States holds most Indian lands in trust for the benefit of Indian tribes and Indian individuals," the Tribe contends that Congress's use of this language, coupled with the substantive requirements of the Act, demonstrates the requisite fiduciary duties satisfying part one of the jurisdictional analysis. *See, e.g.*, *id.* at 26 (quoting 25 U.S.C. § 3901(a)(5)).  The Tribe also points the Court to the legislative history of the Act,[4] common law, and related statutes to support its argument. *See id.* at 30–31, 43.  The Tribe further contends that the Act is money-mandating, satisfying part two of the analysis, given the use of the term "shall" in relation to IHS's provision of assistance and what the Tribe claims is a lack of discretion on the part of the Director to allocate funds. *Id.* at 28, 29, 34–36.

In the Government's view, the Act does not impose fiduciary duties on the Government to clean open dumps or mandate payment of damages for open dumps that exist on tribal lands.

---

[4] Both parties reference the Act's legislative history to bolster their respective arguments. *See, e.g.*, ECF No. 70 at 15–17, 30; ECF No. 72 at 15–18.  Because the statutory language and precedent decisively resolve the issue, the Court need not resort to considering the parties' positions on the legislative history. *See Syngenta Crop Prot., LLC v. Willowood, LLC*, 944 F.3d 1344, 1359 (Fed. Cir. 2019).

Rather, it contends the Act directs the Government only to provide the Tribe with assistance to close open dumps and explicitly conditions such assistance on IHS's discretion to prioritize the expenditure of limited appropriated funds. ECF No. 66-1 at 29–30, 31. Moreover, even if the Act imposes a mandatory duty to provide assistance, the Government argues that duty is contingent upon a request to IHS to "conduct an inventory and evaluation of the contents of open dumps," a request it claims the Tribe has not identified. *Id.* at 27–28 (internal quotation marks omitted) (quoting 25 U.S.C. § 3904(a)(1)(A)).

To resolve the dispute, the Court first looks to whether the Act contains trust-creating language and concludes that it does not impose any specific trust duties on the Government.[5] To be sure, the Act begins with Congress's finding, among others, that "the United States holds most Indian lands in trust for the benefit of Indian tribes and Indian individuals." 25 U.S.C. § 3901(a)(5). More than a statement of a general trust relationship is needed, however, to conclude that the Act imposes fiduciary duties on the Government. *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 894 (D.C. Cir. 2014); *see Mitchell I*, 445 U.S. at 542; *see also Hopi Tribe*, 782 F.3d at 667. In *Mitchell I*, the Supreme Court found that the Allotment Act did not create any duty on the part of the Government to manage tribal timber resources on land allotted under that statute notwithstanding the statute's express declaration that such land was held by the Government "in trust for the sole use and benefit of the Indian." 445 U.S. at 542 (quoting 25 U.S.C. § 348).

---

[5] Whether the Act satisfies the Indian Tucker Act's requirements appears to be a question of first impression in the Federal Circuit. The United States Court of Appeals for the District of Columbia Circuit, however, analyzed the Act in a suit seeking equitable relief based on Administrative Procedure Act and breach-of-trust claims brought by the Navajo Nation. *See El Paso Nat. Gas Co. v. United States*, 750 F.3d 863 (D.C. Cir. 2014). As discussed below, the Court finds the D.C. Circuit's analysis to be persuasive.

In this case, the trust-related language of § 3901(a)(5) is even less prescriptive. It merely states the general principle that the Government holds most Indian lands in trust and makes no further specifications relating to open dumps in general or the Tribe's land specifically. It does not, therefore, "unambiguously provide that the United States has undertaken full fiduciary responsibilities" as to the control, management, or cleanup of the Tribe's open dumps. *Mitchell I*, 445 U.S. at 542; *see El Paso Nat. Gas*, 750 F.3d at 899 (holding the Act "does not vest in the Government—either expressly as in *Mitchell II* or by implication as in *White Mountain*—any responsibility for *management* or *control* of Indian property" (emphasis in original)). Indeed, the language of § 3901(a)(5) obligates the Government to nothing in particular.

Even coupling the language of § 3901(a)(5) with the substantive provisions of § 3904, the Act does not establish the "conventional fiduciary relationship" necessary to satisfy jurisdiction. *Hopi Tribe*, 782 F.3d at 667 (quoting *Navajo II*, 556 U.S. at 301). The Act consistently makes clear that the Tribe, not IHS, is primarily responsible for cleaning open dumps on tribal land. As the Act repeatedly emphasizes, IHS's role is that of providing *assistance*. *See, e.g.*, 25 U.S.C. §§ 3901(b)(3), 3904(b)–(c); *see also El Paso Nat. Gas*, 750 F.3d at 899 (describing the Act as "impos[ing] a duty upon the Director of [IHS] to assist tribal governments as *they*" act to close open dumps (emphasis in original)). Unlike in *Mitchell II*, where the federal timber management statutes and regulations at issue demonstrated the Government's "full responsibility to manage Indian resources and land for the benefit of the Indians," 463 U.S. at 224, the Act lacks any indication of IHS's responsibility to control or manage open dumps on Indian lands, *see* 25 U.S.C. § 3904(b) (defining the authority of the Director to inventory open dumps and provide assistance to tribes subject to certain conditions). When a tribe submits a request for an inventory of open dumps, the Government's role is only that of performing the inventory-related activities and

providing financial and technical assistance for the Indian tribal government "to carry out the activities necessary" to close open dumps. *Id.* §§ 3904(a)–(b); *see El Paso Nat. Gas*, 750 F.3d at 899. Thus, even if the Act mandates some amount of assistance upon satisfaction of the requirements of § 3904(a), the Tribe still retains the principal "responsibility to manage" open dumps on its lands.[6] *Mitchell II*, 463 U.S. at 224; *see El Paso Nat. Gas*, 750 F.3d at 899 ("Because [the Act] contemplates management and control in the hands of tribal governments, the [Act] falls comfortably within the ambit of *Mitchell I*.").

Indeed, the evidence before the Court demonstrates that the Tribe has for decades directly handled its own solid waste management and taken the lead on efforts to close open dumps on the Reservation with assistance from the federal government at the Tribe's request. *See, e.g.*, ECF No. 66-2 at 11 (describing in a 1994 solid waste management plan the Tribal Solid Waste Authority, which was organized to manage the landfill and collection system on the Reservation); Letter from Ronnie Lupe (Chairman) to Benjamin Nuvamsa (BIA) at 2–3, ECF No. 66-16 (detailing the Tribe's 1994 efforts, with IHS's assistance, to close 19 open waste sites); ECF No.

---

[6] Other sections of the Act support interpreting § 3904 as placing responsibility for dump cleanup and maintenance activities in the hands of the tribes. Section 3905 provides that the Director shall implement the Act, "[t]o the maximum extent feasible," through agreements with tribal governments pursuant to the Indian Self-Determination and Education Assistance Act of 1975 ("ISDA"), 25 U.S.C. §§ 5301–5423 (1975). 25 U.S.C. § 3905(a). ISDA serves to assure maximum Indian participation in the direction of educational and other federal services so as to increase the responsiveness of those programs to the needs of Indian communities. *See* 25 U.S.C. § 5302(a); *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 141 S. Ct. 2434, 2439 (2021) (describing ISDA as "decentraliz[ing] the provision of federal Indian benefits away from the Federal Government and toward Native American . . . organizations"). Additionally, § 3906 authorizes the Director to carry out "demonstration projects involving open dumps on Indian land" through the selection and participation of tribal governments that have developed *their own* comprehensive solid waste management plans, and closure and post-closure maintenance plans, for existing open dumps on their land. 25 U.S.C. §§ 3906(a), (b).

66-26; ECF No. 66-28 at 5 (showing the Tribe's commitment to inventory illegal dump sites for the 2010–2011 period using EPA grant funds).

Moreover, the amount of discretion left to the Director to set priorities for allotting assistance to tribes further supports finding that the Act does not satisfy the first part of the jurisdictional analysis. As the D.C. Circuit explained in *El Paso Natural Gas*, the Director's discretion in setting priorities, combined with the Act's prerequisites, indicate that the Act does not provide a "legally required duty to act." 750 F.3d at 891 (internal quotation marks omitted). Indeed, the Act states no precise amount of assistance that IHS must provide and no specific number or percentage of tribes that should receive assistance. *See* 25 U.S.C. § 3904(c). In fact, only one limitation is imposed on the Director's prioritization: that it must take into account "the relative severity of the threat to public health and the environment posed by each dump and the availability of funds." *Id.* Otherwise, the Act leaves to the Director the decision of how to allocate assistance as he deems fit. Easy to envision, then, is a scenario where a tribe receives no assistance (or assistance in an amount far below what is needed) to clean a low threat dump simply because other dumps on other tribal lands are a higher threat and require a larger share of available funds. As the Government aptly notes, permitting any one tribe to compel monetary compensation—from a limited amount of appropriated funds—for an existing open dump on its land would thwart the prioritization scheme that Congress expressly provided. *See* ECF No. 66-1 at 29.

Thus, even if the Act creates a duty for the Director to provide assistance upon the satisfaction of the prerequisites and subject to certain conditions, there is no indication that the Government has "undertaken full fiduciary responsibilities as to the management" of open dumps on the Tribe's land. *Mitchell I*, 445 U.S. at 542. Consequently, the Act lacks any indication of the

"elaborate" government control that courts have found gives rise to fiduciary duties on the part of the Government. *Mitchell II*, 463 U.S. at 225.

The Tribe argues that use of the word "shall" in §§ 3904(a) and 3904(b) is a "dispositive indication that the duties imposed are mandatory and create a fiduciary relationship." ECF No. 70 at 29 (citing, *inter alia*, *Samish Indian Nation v. United States*, 419 F.3d 1355, 1364 (Fed. Cir. 2005), and *Agwiak v. United States*, 347 F.3d 1375, 1380 (Fed. Cir. 2003)). *Agwiak* specifies that "shall" is generally useful in determining whether a statute is money-mandating, not whether it creates a fiduciary duty. 347 F.3d at 1380. *Samish* also addressed whether a statute was money-mandating and recognized that such statutes, unlike the Act, typically "leave[] the government no discretion over payment of claimed funds." 419 F.3d at 1364. The Tribe provides no authority showing that use of the term "shall" alone creates government fiduciary duties, as opposed to some other non-fiduciary obligation, nor has it shown that is the case here.

As discussed, the obligation that the "Director shall . . . provide financial and technical assistance" to tribes to close open dumps on their land, 25 U.S.C. § 3904(b), is conditioned on the Director's discretionary authority to prioritize which tribes receive assistance and the amount of assistance provided. *See id.* § 3904(c). Moreover, the provisions of § 3904(a), which are preconditions for § 3904(b), are predicated on the filing of a tribal inventory request. *See id.* §§ 3904(a), (b). Thus, in the broader context of the Act, the force of the term "shall" is counterbalanced by the Act's conditions and preconditions.

The Tribe's comparison of the Act with the Indian Dams Safety Act ("IDSA"), 25 U.S.C. §§ 3801–3805 (1994), which the court previously found imposes a fiduciary relationship, is also unpersuasive. *See* ECF No. 70 at 29–30; ECF No. 22 at 14. IDSA explicitly provides that the Interior Secretary is responsible for creating "a comprehensive list of dams located on Indian

lands," 25 U.S.C. § 3803(e)(1), and "perform[ing] such rehabilitation work as is necessary to bring the dams identified . . . to a satisfactory condition," *id.* § 3803(c).   Under the Dam Safety Maintenance and Repair Program, the Government—not the tribes—is responsible for dam rehabilitation, maintenance, and monitoring, regardless of any tribal request.   *See id.* §§ 3803(a), (c).   While the Secretary may contract with Indian tribes to carry out these activities, IDSA specifies no mandatory tribal role.   *See id.* § 3803(h).   The role of IHS under the Act is reversed; it is charged with providing government assistance (subject to conditions) for the tribes to carry out the work of cleaning open dumps.[7]   *See id.* § 3904.

The Court likewise disagrees that RCRA, the Snyder Act, and 25 U.S.C. § 162a(d)(8), "provide context for the [Act] and confirm that it creates specific fiduciary duties."   ECF No. 70 at 43; *see* ECF No. 66-47 at 3.   Although the Court may look to "a network of other statutes and regulations" to determine whether a trust duty exists within the Act, *Navajo I*, 537 U.S. at 504–05 (citing *Mitchell II*, 463 U.S. at 224), the statutes the Tribe references provide no support for the notion that the Act vests "comprehensive control" in the Government to manage open dumps on

---

[7] Plaintiff incorrectly suggests that the court's opinion denying in part the Government's first motion to dismiss as to the Tribe's dam safety claims under IDSA, as "law of the case," supports the conclusion that the Act similarly supplies Indian Tucker Act jurisdiction.   ECF No. 70 at 30 (citing ECF No. 22 at 14); *see id.* at 11, 41.   The prior opinion, however, did not evaluate whether the two acts contain similar trust-creating, money-mandating language or whether they are distinguishable.   Indeed, the opinion did not address the Act or the substance of Plaintiff's open dump claim at all, nor did the parties litigate (or the court decide) the question of jurisdiction over that claim.   *See* ECF No. 22 at 9–10.   Rather, acknowledging that the Tribe needed more time to "determine the status and nature of the . . . contamination so it can specify claims in detail based on the legal duties of the Government to enforce applicable law," it "indulge[d]" the Tribe's request for limited discovery and denied without prejudice the Government's motion to dismiss the open dump claim, among other claims.   *Id.* at 10.   Thus, the instant decision does not run afoul of the law-of-the-case doctrine.   *See ArcelorMittal Fr. v. AK Steel Corp.*, 786 F.3d 885, 888 (Fed. Cir. 2015) (explaining that, except in extraordinary circumstances, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case" (internal quotation marks and citation omitted)).

Indian lands, *Mitchell II*, 463 U.S. at 209 (internal quotation marks omitted), as the Government correctly argues.  *See* ECF No. 66-1 at 31–37.

The Snyder Act "governs the general appropriations of [BIA]," *White Mountain Apache Tribe v. United States*, 249 F.3d 1364, 1372 (Fed. Cir. 2001), and dictates that BIA "direct, supervise, and expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians," 25 U.S.C. § 13.  The listed purposes for which funding may be allotted makes no mention of Indian lands generally or in relation to open dumps specifically. *See id.*  Furthermore, the statute does not dictate *how* funds should be expended towards each purpose.  It therefore does not impose "legally binding obligations."  *Lincoln v. Vigil*, 508 U.S. 182, 194 (1993); *see Hopi*, 782 F.3d at 670–71 (rejecting similar argument that the Snyder Act, as part of a larger group of statutes, demonstrated the Government's comprehensive control over water resources).

As for § 162a(d)(8), the Court again agrees with the Government.  This provision only defines the Government's trust responsibilities "with respect to tribal *funds*," not tribal lands. *Jicarilla*, 564 U.S. at 178 (emphasis added); *see* 25 U.S.C. § 162a; *Hopi*, 782 F.3d at 670 n.1 (stating that § 162a(d)(8) only "detail[s] the United States' trust responsibilities in managing tribal funds and investments, which are not relevant to the management of drinking water quality").  Moreover, even though it directs the Government to appropriately manage natural resources on tribal lands, it does not include "specific rights-creating or duty-imposing" prescriptions for natural resource management and, as relevant here, solid waste management.  *Navajo I*, 537 U.S. at 506.

Likewise, RCRA, as a statute of general applicability, is unsupportive.  *See El Paso Nat. Gas Co.*, 750 F.3d at 899.  Rather than imposing fiduciary duties on the Government vis-à-vis open dumping, RCRA mandates that states work to close or upgrade existing open dumps.  *See* 42

U.S.C. §§ 6943(a)(3), 6945(a).  RCRA also applies to tribes, which, as at least one court has found, have "the responsibility to regulate, operate, and maintain the dumps" on their tribal lands as part of their inherent sovereignty.  *Blue Legs v. U.S. Env't Prot. Agency*, 668 F. Supp. 1329, 1337 (D.S.D. 1987), *aff'd sub. nom. Blue Legs v. U.S. Bureau of Indian Affs.*, 867 F.2d 1094 (1989). With respect to solid waste, the federal government's role, among other things, is to provide discretionary assistance to states in implementing their waste management plans and limited, discretionary enforcement of the open dumping prohibition. *See* 42 U.S.C. § 6948(a) (authorizing lump-sum appropriations in fiscal years 1980–1982 and 1985–1988 to provide financial assistance to states and other authorities); *id.* § 6948(d) (authorizing the EPA Administrator to provide technical assistance to state and other authorities); *id.* § 6945(c)(2)(A) (authorizing the EPA Administrator to enforce the prohibition with respect to solid waste management facilities in a state).  Alleged violations of RCRA's open dumping prohibition are also subject to citizen suits in federal district court. *See id.* §§ 6945(a), 6972.  To be sure, the Government may be liable for its own actions that violate RCRA, including its contribution to open dumping on tribal lands, *see Blue Legs*, 668 F. Supp. at 1341, but nothing in the statute "establish[es] a conventional fiduciary relationship" between tribes and the Government sufficient to support a breach of trust claim, *El Paso Nat. Gas Co.*, 750 F.3d at 899.  Consequently, even when viewing the Act as informed by these other statutes, it cannot establish the creation of fiduciary duties; the Government's "elaborate control" of open dumps is missing. *Mitchell II*, 463 U.S. at 225.

Finally, the Tribe contends that the Government's reliance on *El Paso Natural Gas* is misplaced.  It distinguishes that case on the basis that it "was not a suit in the Federal Court of Claims for money damages, did not involve the Indian Tucker Act, and did not involve the same statutory language in the [Act]."  ECF No. 70 at 32.  Although Plaintiff is correct that *El Paso*

*Natural Gas* involved a claim brought in district court for equitable relief, not money damages, it is a distinction without a difference. As the Government correctly notes, in resolving the question of whether the tribe pled a cognizable breach of trust claim for the Government's alleged failure to provide the tribe with financial and technical assistance under the Act, the D.C. Circuit analyzed whether the Act established specific duties that characterized a conventional fiduciary relationship. *See* ECF No. 72 at 9 (citing *El Paso Nat. Gas*, 750 F.3d at 893–95, 899). In holding that it did not, for the reasons discussed above, the Court specifically contemplated Indian Tucker Act precedent and rejected the distinctions pushed by the Tribe here.[8] *See El Paso Nat. Gas*, 750 F.3d at 895–96. Regardless, this Court has analyzed the Act under Supreme Court and Federal Circuit precedent and independently concludes that it imposes no specific fiduciary obligations on the Government over the Tribe's open dumps.

Accordingly, the Court finds that the Act lacks the "hallmarks of a conventional fiduciary duty" and thus cannot support jurisdiction. *Navajo II*, 556 U.S. at 301 (internal quotation marks and citation omitted). The Tribe's Phase I claim is dismissed accordingly.[9]

---

[8] The Court's analysis of the tribe's Administrative Procedure Act ("APA") claim is also instructive. To resolve that claim, the D.C. Circuit analyzed whether the Act imposed a mandatory duty on the Director to provide financial and technical assistance to the tribe under the Act. *El Paso Nat. Gas*, 750 F.3d at 891. It held that because the Director's duty was conditioned on the tribe submitting a request (a prerequisite not established by the tribe) and because he had "discretion in doling out assistance" the Director had no "'legally required' duty" to provide assistance to the tribe. *Id.* As the Court explained, the analyses of the tribe's causes of action overlapped. Its failure to identify "a substantive source of law establishing *specific fiduciary duties*" was "fatal . . . regardless of whether [the Court] read the claim as brought under the APA or under a cause of action implied by the nature of the fiduciary relationship itself." *Id.* at 892 (emphasis in original).

[9] Because the Court's determination is sufficient to resolve the jurisdictional question solely based on whether the Tribe has identified any specific fiduciary obligations, it is not necessary to address the parties' arguments regarding whether the Act is money-mandating. *See Hopi*, 782 F.3d at 671 (declining to address whether the cited statutes were money-mandating since they failed to establish a specific fiduciary obligation of the Government).

## III. CONCLUSION

For the reasons stated above, the Court **GRANTS** the Government's Motion to Dismiss (ECF No. 66).  Having concluded that the Act does not establish any specific fiduciary obligations on the part of the Government necessary to confer jurisdiction on this Court under the Indian Tucker Act, the Tribe's Phase I open dump claim is hereby **DISMISSED** pursuant to RCFC 12(b)(1).  Additionally, because the Tribe has voluntarily withdrawn its Phase I minerals, leases, rights-of-way, and non-dump contamination claims, those claims also are **DISMISSED**.  In light of the Court's determination that it lacks jurisdiction over the Tribe's claim, the Government's alternative request for summary judgment is **DENIED AS MOOT.**

The Court hereby **ORDERS** the parties to file a joint status report **by no later than January 18, 2022**, proposing a schedule for further proceedings related to the Tribe's Phase II claims.

**SO ORDERED**.


Dated: December 16, 2021                              */s/ Kathryn C. Davis*
                                                     KATHRYN C. DAVIS
                                                     Judge